## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUNWEI LIU, derivatively on behalf of PLUG POWER INC., | |
| Plaintiff, | Case No.: |
| v. | |
| ANDREW MARSH, PAUL B. MIDDLETON, MAUREEN O. HELMER, GREGORY L. KENAUSIS, GEORGE C. MCNAMEE, JOHANNES MINHO ROTH, LUCAS P. SCHNEIDER, JONATHAN SILVER, and GARY K. WILLIS | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| PLUG POWER INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Junwei Liu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Plug Power Inc. ("Plug Power" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Andrew Marsh, Paul B. Middleton, Maureen O. Helmer, Gregory L. Kenausis, George C. McNamee, Johannes Minho Roth, Lucas P. Schneider, Jonathan Silver, and Gary K. Willis (collectively, the "Individual Defendants" and with Plug Power, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Plug Power, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants,

1

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Plug Power, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Plug Power's directors and officers between November 9, 2020 through March 1, 2021, both dates inclusive (the "Relevant Period").

2.      Plug Power is a Delaware corporation based in Latham, New York, that develops and sells hydrogen and fuel cell technology for use in vehicles as well as stationary applications.

3.      Beginning November 9, 2020 and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Plug Power's business, operations, and prospects. Specifically, they issued positive financial information and optimistic guidance, and made assurances that the Company's internal controls were effective.

4.      In reality, the Company's internal controls suffered from material deficiencies that rendered them ineffective. Specifically, the Company was improperly accounting for its non-cash items, including reported book value of right of use assets and related financial obligations, loss accruals for certain service contracts, the impairment of certain long-lived assets, and the

classification of certain costs that resulted in decreased research and development ("R&D") expenses and increased costs of revenue. As a result, the Company would be incapable of filing their annual report with the SEC for the fiscal year ended December 31, 2021 and would need extra time to ensure the accuracy of both their upcoming and previous financial statements, which would need to be restated.

5.      Despite the foreseeability of these issues, the Individual Defendants continued to tout the Company's prospects and failed to disclose the impending restatements. Their misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time three of the Individual Defendants benefitted from lucrative insider sales at artificially inflated prices for collective proceeds in excess of $39.5 million.

6.      The truth began to emerge on March 2, 2021, when the Company filed a Notification of Late Filing with the SEC on Form 12b-25. The notification revealed that Plug Power was undertaking a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas." The Notification of Late Filing further revealed that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements."

7.      On this news, which was released before the markets opened, the Company's share price declined by $3.68 per share—more than 7%—from its March 1, 2021 closing price of $52.46 per share to close March 2, 2021 at $48.78. This slide continued over the next three trading days,

with Plug Power's share price dropping $9.48 per share—an additional 19.4%—to close March 5, 2021 at $39.30 per share.

8.      Then on March 16, 2021, after the market closed, the Company filed a current report on Form 8-K with the SEC in which it disclosed that the "previously issued financial statements as of and for the years ended December 31, 2019 and 2018, and as of and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, and September 30, 2020 and 2019" could all no longer be relied upon and the Company would need to file a restatement due to, *inter alia*, "errors in accounting primarily relating to (i) the reported book value of right of use assets and related finance obligations ("ROU Accounting"), (ii) loss accruals for certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) the classification of certain expenses previously included in research and development costs [.]" The Company also announced that the fourth quarter and full year results for 2020 should no longer be relied upon and that the Company expected to disclose a material weakness in its internal controls in its late, and still unfiled, annual report for the fiscal year ended December 31, 2020 (the "2020 10-K"). The current report also maintained that the Company's internal review remained ongoing and could result in the identification of further errors.

9.      The same day, on March 16, 2021, the Company issued a press release announcing that the restated filings would be disclosed in the Company's 2020 10-K, the filing deadline for which the Company would not be able to meet.

10.     On March 18, 2021, the Company filed a Notice of Delisting with the SEC, informing investors that the Nasdaq Stock Market LLC had notified Plug Power that it was subject to delisting if it failed to file the 2020 10-K by May 17, 2021.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary

duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's financial statements and internal controls were plagued with material deficiencies that would foreseeably inhibit Plug Power from timely filing the 2020 10-K with the SEC; (2) the Company would need to review how it treated certain costs, the recoverability of right to uses assets connected to certain leases, and its own internal controls over these and other areas; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, Plug Power's public statements touting positive metrics and giving optimistic guidance were materially false and misleading at all relevant times.

12.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while three of the Individual Defendants sold Company shares at inflated prices.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.    In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York and the United States District Court Central District of California, respectively (the "Securities Class Actions"),  the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly

overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's and CFO's liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Plug Power. Plaintiff has continuously held Plug Power common stock at all relevant times.

23.     Plaintiff is a citizen of Illinois.

### Nominal Defendant Plug Power

24.     Plug Power is a Delaware corporation with its principal executive offices at 968 Albany Shaker Road, Latham, New York 12110. Plug Power's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "PLUG."

### Defendant Marsh

25.     Defendant Andrew Marsh ("Marsh") is the Company's President and CEO, as well as a Company director, and has served in all three roles since April 2008. According to the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 13, 2020, Defendant Marsh beneficially owned 3,808,437 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $4.12, Defendant Marsh owned approximately $15.7 million worth of Plug Power stock.

26.     As CEO and President, Defendant Marsh is entitled to substantial compensation from the Company for the fiscal years ended December 31, 2020 and December 31, 2021.

Defendant Marsh receives an annual salary of $600,000 and is eligible to receive an annual incentive bonus at an amount equal to 100% of his annual salary, among other benefits.

27.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Marsh made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| January 19, 2021 | 573,268 | $65.67 | $37,646,509 |

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.     Upon information and belief, Defendant Marsh is a citizen of New York.

29.     The 2020 Proxy Statement stated the following about Defendant Marsh:

*Andy Marsh* joined Plug Power as President and CEO in April 2008. Under his leadership, Plug Power has led innovation, bringing the hydrogen fuel cell market from concept to commercialization, as the world moves forward towards electrification. Early on, Mr. Marsh identified material handling as the first commercially viable market targeted by Plug Power. Today, the firm's fuel cell solutions are leveraged by world leaders such as Amazon, Walmart, and Carrefour to power industrial electric vehicles. As President and CEO, Mr. Marsh plans and directs all aspects of the organization's policies and objectives, and is focused on building a company that leverages Plug Power's combination of technological expertise, talented people and focus on sales growth to continue the Company's leadership stance in the future alternative energy economy. Mr. Marsh continues to spearhead hydrogen fuel cell innovations, and his ability to drive revenue growth has landed Plug Power on Deloitte's Technology Fast 500TM list in 2015 and 2016. Previously, Mr. Marsh was a co-founder of Valere Power, where he served as CEO and Board Member from the Company's inception in 2001, through its sale to Eltek ASA in 2007. Under his leadership, Valere grew into a profitable global operation with over 200 employees and $90 million in revenue derived from the sale of DC power products to the telecommunications sector. During Mr. Marsh's tenure, Valere Power received many awards such as the Tech Titan award as the fastest growing technology company in the Dallas Fort Worth area and the Red Herring Top 100 Innovator Award. Prior to founding Valere, he spent almost 18 years with

Lucent Bell Laboratories in a variety of sales and technical management positions. Mr. Marsh is a prominent voice leading the hydrogen and fuel cell industry. Nationally, he is the Chairman of the Fuel Cell and Hydrogen Energy Association, and sits as a member of the Hydrogen and Fuel Cell Tactical Advisory Committee ("HTAC"). HTAC has the important responsibility to provide advice to the Department of Energy regarding its hydrogen and fuel cell program goals, strategies, and activities. Internationally, Mr. Marsh represents Plug Power in their role as supporting members of the Hydrogen Council, a global initiative of leading energy, transport and industry companies with a united vision and long-term ambition for hydrogen to foster the energy transition Mr. Marsh has also served on the board of directors of GEVO, Inc. since February 2015. Mr. Marsh holds an MSEE from Duke University and an MBA from Southern Methodist University.

**Defendant Middleton**

30.     Defendant Paul B. Middleton ("Middleton") has served as CFO since December 2014. According to the 2020 Proxy Statement as of April 13, 2020, Defendant Middleton beneficially owned 1,340,505 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $4.12, Defendant Middleton owned approximately $5.5 million worth of Plug Power stock.

31.     For the fiscal years ended December 31, 2020 and December 31, 2021, Defendant Middleton is entitled to significant compensation from the Company as CFO. Defendant Middleton receives an annual salary of $375,000 and is eligible to receive an annual incentive bonus at an amount equal to 100% of his annual salary, among other benefits.

32.     Upon information and belief, Defendant Middleton is a citizen of New York.

33.     The 2020 Proxy Statement stated the following about Defendant Middleton:

*Paul B. Middleton* joined Plug Power as Senior Vice President and Chief Financial Officer in 2014. Prior to Plug Power, Mr. Middleton worked at Rogers Corp., a global manufacturer and distributor of specialty polymer composite materials and components, from 2001 to 2014. During his tenure at Rogers Corp., Mr. Middleton served in many senior financial leadership roles, including Corporate Controller and Principal Accounting Officer, Treasurer and Interim Chief Financial Officer. Prior to Rogers Corp., Mr. Middleton managed all financial administration for the tools division of Coopers Industries from 1997 to 2001. Mr. Middleton holds a

Master of Science in Accounting and a BBA from the University of Central Florida. Additionally, he is a Certified Public Accountant.

**Defendant Helmer**

34.     Defendant Maureen O. Helmer ("Helmer") has served as a Company director since January 2004. She also serves as Chair of the Corporate Governance and Nominating Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Helmer beneficially owned 527,726 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $4.12, Defendant Helmer owned approximately $2.2 million worth of Plug Power stock.

35.     Upon information and belief, Defendant Helmer is a citizen of New York.

36.     The 2020 Proxy Statement stated the following about Defendant Helmer:

*Maureen O. Helmer* has been a director of the Company since 2004. Ms. Helmer is currently a member of the law firm Barclay Damon, LLP and is the Co-Chair of the firm's Regulatory Practice Area. Prior to her joining Barclay Damon, LLP, Ms. Helmer was a member of Green & Seifter Attorneys, PLLC. From 2003 through 2006, she practiced as a partner in the law firm of Couch White, LLP and then as a solo practitioner. Ms. Helmer has advised international energy, telecommunications and industrial companies on policy and government affairs issues. In addition to serving as Chair of the New York State Public Service Commission ("PSC") from 1998 to 2003, Ms. Helmer also served as Chair of the New York State Board on Electric Generation Siting and the Environment. Prior to her appointment as Chair, Ms. Helmer served as Commissioner of the PSC from 1997 until 1998 and was General Counsel to PSC from 1995 through 1997. From 1984 through 1995, Ms. Helmer held several positions in the New York Legislature, including Counsel to the Senate Energy Committee. She also served as a board member of the New York State Energy Research and Development Authority, the New York State Environmental Board and the New York State Disaster Preparedness Commission during her tenure as Chair of the PSC. In addition, she was Vice Chair of the Electricity Committee of the National Association of Regulatory Utility Commissioners and a member of the NARUC Board of Directors. She was also appointed to serve as a member of the New York State Cyber-Security Task Force. She formerly served as a board member of the Center for Internet Security, the Center for Economic Growth, and New York Women in Communications and Energy. Ms. Helmer earned her Bachelor of Science from the State University at Albany and her Juris Doctorate from the University of Buffalo law school. She is admitted to practice law in New York. We believe Ms. Helmer's

qualifications to sit on our Board include her long history of experience with energy regulation, policy and government affairs and advising energy and industrial companies.

**Defendant Kenausis**

37.     Defendant Gregory L. Kenausis ("Kenausis") has served as a Company director since October 2013. He also serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Kenausis beneficially owned 410,909 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $4.12, Defendant Kenausis owned approximately $1.7 million worth of Plug Power stock.

38.     Upon information and belief, Defendant Kenausis is a citizen of Switzerland.

39.     The 2020 Proxy Statement stated the following about Defendant Kenausis:

*Gregory L. Kenausis* has been a director of the Company since October 2013. Dr. Kenausis is the founding partner and since 2005 has been the Chief Investment Officer of Grand Haven Capital AG, an investment firm, where he is the head of research and trading activity and is responsible for managing the fund's operations and structure. He also has worked extensively as a business consultant with a focus on business development and strategy, as well as valuation. Dr. Kenausis earned a bachelor's degree from Yale University and a doctoral degree from the University of Texas at Austin. We believe Dr. Kenausis's qualifications to sit on our Board include his background and senior level experience in financial investments, business development and strategy, management and equity capital markets.

**Defendant McNamee**

40.     Defendant George C. McNamee ("McNamee") has served as a Company director and Chairman of the Board since June 1997. He also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant McNamee beneficially owned 1,498,568 shares of Company common stock. Given that the price per share of the Company's common stock was $4.12 the at the close of trading on April 13, 2020, Defendant McNamee owned approximately $6.2 million worth of Plug Power common stock.

41.     For the fiscal years ended December 31, 2020 and December 31, 2021, Defendant McNamee is entitled to significant compensation from the Company as Chairman of the Board.

42.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant McNamee made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| January 8, 2021 | 10,000 | $52.07 | $520,700 |
| January 12, 2021 | 10,000 | $62.40 | $624,000 |
| January 13, 2021 | 10,000 | $70.45 | $704,500 |

Thus, before the scheme was exposed, Defendant McNamee sold 30,000 shares of Company common stock at artificially inflated prices for proceeds of $1,849,200. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

43.     Upon information and belief, Defendant McNamee is a citizen of New York.

44.     The 2020 Proxy Statement stated the following about Defendant McNamee:

*George C. McNamee* serves as Chairman of the Company's Board of Directors and has served as such since 1997. He was previously Chairman of First Albany Companies Inc. and a Managing Partner of FA Tech Ventures, an information and energy technology venture capital firm. As an executive and director of numerous companies, Mr. McNamee has navigated technological change, rapid- growth, crisis management, team building and strategy. As a public company director, Mr. McNamee has led board special committees, chaired audit committees, chaired three boards and has been an active lead director. Mr. McNamee has previously served on several public company boards, including the boards of Mechanical Technology Inc. and the Home Shopping Network. He has been an early stage investor, director and mentor for private companies that subsequently went public including MapInfo (now Pitney Bowes), META Group (now Gartner Group) and iRobot Corporation, where he served as a director from 1999 to 2016 and as lead director for the last 11 of those years. In 2011, Mr. McNamee was the first history major awarded the Yale Science and Engineering Association Distinguished Service Award. He served as a NYSE director from 1999 to 2004 and chaired its

foundation. In the aftermath of the 1987 stock market crash, he chaired the Group of Thirty Committee to reform the Clearance and Settlement System. Mr. McNamee has been active as a director or trustee of civic organizations including The Albany Academies and Albany Medical Center, whose Finance Committee he chaired for 12 years. He is also a director of several private companies, a Sterling Fellow of Yale University and a Trustee of The American Friends of Eton College. He conceived and co-authored a book on the Chicago Conspiracy Trial. He received his Bachelor of Arts degree from Yale University. We believe Mr. McNamee's qualifications to sit on our Board include his experience serving on technology company boards, his background in investment banking, which has given him broad exposure to many financing and merger and acquisition issues, and experience with the financial sector and its regulatory bodies.

**Defendant Roth**

45.     Defendant Johannes Minho Roth ("Roth") has served as a Company director since April 2013. He also serves as a member of both the Compensation Committee and the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Roth beneficially owned 3,225,682 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $4.12, Defendant Roth owned approximately $13.3 million worth of Plug Power stock.

46.     Upon information and belief, Defendant Roth is a citizen of Switzerland.

47.     The 2020 Proxy Statement stated the following about Defendant Roth:

*Johannes M. Roth* has been a director of the Company since April 2013. Mr. Roth is the founder of and, since 2006, has been Managing Director and Chairman of FiveT Capital Holding AG, an investment holding company based in Switzerland with businesses specializing in asset management, risk management and alternative investments. Since 2006, Mr. Roth has been a board member of FiveT Capital AG, Zürich, Switzerland, which advises several long-only funds and operates an asset management business for high net-worth individuals. Mr. Roth has also served on the board of directors of GEVO, Inc. since July 2015. Mr. Roth earned a master's degree in Management and Economics from the University of Hohenheim. We believe Mr. Roth's qualifications to sit on our Board include his background in financial investments, financial and risk management and equity capital markets as well as his experience in management positions.

**Defendant Schneider**

48.     Defendant Lucas P. Schneider ("Schneider") has served as a Company director since March 2017. He also serves as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Schneider beneficially owned 304,190 shares of Company common stock. Given that the price per share of the Company common stock was $4.12 at the close of trading on April 13, 2020, Defendant Schneider owned approximately $1.3 million worth of Plug Power common stock.

49.     Upon information and belief, Defendant Schneider is a citizen of Texas.

50.     The 2020 Proxy Statement stated the following about Defendant Schneider:

*Lucas P. Schneider* has served as a director of the Company since March 2017. Mr. Schneider is the Chief Operating Officer of Wejo, Ltd., an early-stage connected vehicle data marketplace company. Prior to to [sic] his current role, Mr. Schneider has served as the Chief Executive Officer of Silvercar, an Austin, TX-based start-up that focuses on the rental car space and other vehicle mobility applications from 2012 until December, 2018 [sic]. In 2017, Silvercar was acquired by Audi AG. Prior to Silvercar, Mr. Schneider was the Chief Technology Officer of Zipcar. He served at Flexcar as Chief Technology Officer and Vice President of Strategy. He has also held various positions with Ford. Mr. Schneider received a Master of Business Administration, specializing in Operations and Strategy from the Tepper School of Business at Carnegie Mellon University and a Bachelor of Science degree in Mechanical Engineering from University of Texas at Austin. We believe Mr. Schneider's qualifications to sit on our Board include his extensive experience in helping guide companies, ranging from start-ups to large enterprises, through major business milestones including IPOs, mergers, acquisitions, and product development.

**Defendant Silver**

51.     Defendant Jonathan Silver ("Silver") has served as a Company director since June 2018. He also serves as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Silver beneficially owned 149,287 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on April 13, 2020 was $4.12, Defendant Silver owned approximately $615,000 worth of Plug Power stock.

52.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Silver made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| January 11, 2021 | 1,780 | $48.92 | $87,077 |

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

53.     Upon information and belief Defendant Silver is a citizen of Washington, D.C.

54.     The 2020 Proxy Statement stated the following about Defendant Silver:

*Jonathan Silver* has served as a director of the Company since June 2018. Mr. Silver is one of the nation's leading clean economy investors and advisors. Named one of the country's top-ten green-tech "influencers", Mr. Silver led both the federal government's $40 billion clean energy investment fund and its $20 billion fund focused on electric vehicles from 2009 to 2011. Since 2015, Mr. Silver has served as the Managing Partner of Tax Equity Advisors LLC, an advisory firm managing investments in solar power projects on behalf of large corporations. He currently sits on the boards of National Grid (NGG:NSYE), a global utility, and Intellihot, a leading player in the tankless water heating space. Earlier, he served on the board of Eemax and Sol Systems and as a Senior Advisor to ICF, one of the country's largest energy and environmental consulting firms, and to NextEra, the nation's largest energy provider, and Marathon Capital, a leading power industry-focused investment bank. In 1999, Mr. Silver was the co-founder of Core Capital Partners, a successful venture capital investor in battery technology, advanced manufacturing, telecommunications and software. From 1990 to 1992, he was a Managing Director, and the Chief Operating Officer of Tiger Management, one of the country's largest and most successful hedge funds. He has also held senior operating positions, including chief operating officer and executive vice president, in several companies. Mr. Silver began his career in 1982 at McKinsey and Company, a global management consulting firm, working on strategic planning efforts for some of the nation's largest financial institutions and corporations. Mr.

Silver has served as a senior advisor to four U.S. Cabinet Secretaries: Energy (2009 to 2011), Commerce (1992 to 1993), Interior (1993 to 1995) and Treasury (1992 to 1994). He is on the board of Resources for the Future and has been on the boards of the Wind Energy Foundation and American Forests. We believe Mr. Silver's qualifications to sit on our board include his extensive experience with the alternative energy industry.

**Defendant Willis**

55.     Defendant Gary K. Willis ("Willis") has served as a Company director since March 2003. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Willis beneficially owned 645,828 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on Aril 13, 2020 was $4.12, Defendant Willis owned approximately $2.7 million worth of Plug Power stock.

56.     Upon information and belief, Defendant Willis is a citizen of Connecticut.

57.     The 2020 Proxy Statement stated the following about Defendant Willis:

*Gary K. Willis* has been a director of the Company since 2003. Mr. Willis previously served as the President of the Zygo Corporation ("Zygo") from February 1992 to 1999 and the Chief Executive Officer from 1993 to 1999. Mr. Willis served as a director of Zygo from 1992 to November 2000, including as Chairman of the Board from 1998 to 2000. Zygo, which was acquired in 2014 by Ametek, Inc., was a provider of metrology, optics, optical assembly, and systems solutions to the semiconductor, optical manufacturing, and industrial/automotive markets. Prior to joining Zygo, Mr. Willis served as the President and Chief Executive Officer of The Foxboro Company, a manufacturer of process control instruments and systems. Mr. Willis holds a Bachelor of Science degree in Mechanical Engineering from Worcester Polytechnic Institute. We believe Mr. Willis' qualifications to sit on our Board include his extensive experience in management and director positions with similar companies, as well as his educational background in mechanical engineering.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers, directors, and/or fiduciaries of Plug Power and because of their ability to control the business and corporate affairs of Plug Power, the Individual Defendants owed Plug Power and its shareholders fiduciary obligations of trust, loyalty,

good faith, and due care, and were and are required to use their utmost ability to control and manage Plug Power in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Plug Power and its shareholders so as to benefit all shareholders equally.

59.     Each director and officer of the Company owes to Plug Power and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Plug Power, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     To discharge their duties, the officers and directors of Plug Power were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Plug Power, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Plug Power's Board at all relevant times.

63.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASQAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

64.     To discharge their duties, the officers and directors of Plug Power were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Plug Power were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Plug Power's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Plug Power conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Plug Power and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Plug Power's operations would comply with all applicable laws and Plug Power's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.      Each of the Individual Defendants further owed to Plug Power and the shareholders the duty of loyalty requiring that each favor Plug Power's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Plug Power and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, directorial, and controlling positions with Plug Power, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

68.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Plug Power.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Plug Power was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Plug Power, and was at all times acting within the course and scope of such agency.

**PLUG POWER'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

*Plug Power's Code of Conduct*

74.     In a section titled, "Individual Responsibility," the Company's Code of Conduct states that it "sets forth expectations to help guide the actions and behaviors of all employees in the organization . . . . Additionally, the Code of Conduct is expected to be upheld by non-employee members of the Board of Directors[.]"

75.     The Code of Conduct further states, under "Communication,", in relevant part:

As a publicly traded Company, our organization must also comply with a variety of regulations that promote transparency in financial markets and the accuracy of information shared with the investment community. The reports and documents that we file with or furnish to the Securities and Exchange Commission, and our earnings releases and similar public communications made by our organization, must include fair, timely and understandable disclosure.

(Emphasis added.)

76.     In addition, the Code of Conduct states, in relevant part, under, "Conducting Business with Customers, Supplies and Others":

It is incumbent upon each member of the organization to ensure that we operate fairly, openly, ethically, lawfully and honestly with these important stakeholders. No director, officer or employee should take unfair advantage of another person in business dealings on Plug Power's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

77.     Under, "Privacy and Confidentiality," the Code of Conduct provides that "[d]irectors, officers and employees shall use confidential information solely for legitimate Company purposes."

78.     Moreover, under "Accuracy of Company Records," the Code of Conduct states:

Our organization prepares and utilizes a variety of documents and records in the course of doing business. Specific examples include: financial reports, employee timecards, expense reports, corporate books, contracts and a variety of other such documents and records. These documents and records are critical to help guide business decision making while also having financial implications to business operations. Our organization also utilizes both internal and external auditor partners to validate the integrity, reliability and accuracy of Company records [sic] As such, Plug Power employees are responsible to ensure the integrity of these records by contributing accurate and timely data. No director, officer or employee may cause Plug Power to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer or employee may create any false or artificial documentation or book entry for any transaction entered into by Plug Power. Any purposeful falsification of Company documents will be considered as misconduct and will lead to disciplinary action up to and including termination.

79.     With respect to "Conflicts of Interest," the Code of Conduct requires that the Company's "directors, officers and employees must avoid situations that present a potential or actual conflict between their personal interests and Plug Power's interests." This includes a prohibition on "[u]tilizing Company proprietary or confidential information for personal gain[.]"

80.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part:

> Plug Power seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting Plug Power's business or in performing his or her day-to-day Company duties, nor shall any director, officer or employee instruct others to do so.

> If you become aware of the violation of any law, rule or regulation by the Company, whether by its directors, officers, employees, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the Compliance Officer.

81.     Finally, the Code of Conduct provides that "[a]ll employees and managers are obliged to report possible violations of law, the Code of Conduct or any other Company policy or procedure."

***Audit Committee Charter***

82.     The Audit Committee Charters states that, among other purposes, one of the Audit Committee's purposes is to "oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements."

83.     The Audit Committee Charter also enumerates a number of responsibilities which the Audit Committee has, including with respect to "Audited Financial Statements and Annual Audit." It states, in relevant part:

- The Audit Committee shall review the overall audit plan with the Independent Auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial

Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the Independent Auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee must review:

    (i)     any analyses prepared by management and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

    (ii)     major issues as to the adequacy of the Company's internal controls including any special audit steps adopted in light of material control deficiencies;

    (iii)     major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

    (iv)     the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

                    *          *          *

- If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the CEO and CFO of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial

information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the Independent Auditors of the matters required to be discussed by SAS 61 or other professional standards relevant to required communications between independent auditors and audit committees, and (3) with the Independent Auditors concerning the Independent Auditors' independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

84.     Further, the Audit Committee Charter places the following under the responsibility of the Audit Committee:

### E. Unaudited Quarterly Financial Statements

- The Audit Committee shall discuss with management and the Independent Auditor, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) any such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

### F. Earnings Press Releases

- The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

85.     Finally, the Audit Committee Charter also requires the following of the Audit Committee:

### I. Regular Reports to the Board

- The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Independent Auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

**J. Legal and Regulatory Compliance**

- The Audit Committee may discuss with management and the Independent Auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries, and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

86.     The Individual Defendants violated the Code of Conduct, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, three of the Individual Defendants violated the Code of Conduct by selling Company shares at inflated prices for aggregate proceeds in excess of $39.5 million. Further, in violation of the Code of Conduct and the Audit Committee Charter, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.     Plug Power is a Delaware corporation based in Latham, New York that develops

and sells hydrogen and fuel cell technology for use in vehicles as well as stationary applications.

88.     Plug Power went public via an initial public offering in November 1999, and since

that time its shares have traded on the NASDAQ and it has been subject to SEC reporting

requirements.

89.     As a publicly traded company, Plug Power is required to prepare its financial

statements in accordance with U.S. generally accepted accounting principles.

### False and Misleading Statements Made During the Relevant Period

*November 9, 2020 Shareholder Letter and Quarterly Report*

90.     On November 9, 2020, Plug Power released its financial results for the third fiscal

quarter of 2020, ended September 30, 2020. In a letter to shareholders signed by Defendants Marsh

and Middleton and posted on the Company website that day, Plug Power represented that:

> Plug Power achieved a record third quarter with gross billings of $125.6M, the
> highest quarter in the company's 22-year history. This gross billing is over 10%
> higher than the previous guidance and reflects growth of 106% year-over-year and
> 73.4% sequentially, above another record quarter in Q2 2020. Plug Power is raising
> 2020 full-year gross billings guidance to $325M-$330M up from $310M.

91.     That same day, the Company filed its quarterly report for the period ended

September 30, 2020 with the SEC on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q was signed

on behalf of the Company by Defendants Marsh and Middleton and contained certifications, also

signed by Defendants Marsh and Middleton, pursuant to Rules 13a-14(a) and 15d-14(a) under the

Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the

financial statements contained in the 3Q20 10-Q, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

92.     The 3Q20 10-Q reiterated the financial results from the same-day shareholder letter and further stated the following regarding the Company's internal controls, in pertinent part:

(a)     Disclosure controls and procedures.

*The chief executive officer and chief financial officer*, *based on their evaluation of disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q, *have concluded that the Company's disclosure controls and procedures are effective* for ensuring that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in filed or submitted reports is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer as appropriate, to allow timely decisions regarding required disclosure.

(b)     Changes in internal control over financial reporting.

There were no changes in the Company's internal control over financial reporting that occurred during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added.)

*February 25, 2021 Shareholder Letter*

93.     On February 25, 2021, the Company posted a letter to shareholders on its website announcing financial results for the fourth fiscal quarter and full fiscal year 2020, both ended December 31, 2020. The letter was signed by Defendants Marsh and Middleton and stated the following, in pertinent part:

**Plug Power Reports $337 million in Gross Billings for 2020, Up 42.5% Year over Year**

Announced Multiple Partnerships and Executed Strategic Acquisitions,
Establishing Global Platform as a Green Hydrogen Solutions Company

Well Positioned to Leverage Industry Leadership and Capture Meaningful Share
of in the $10T Hydrogen Economy

● 2020 marked a record year in gross billings, with Q4 gross billings of $96.3 million and $337 million for the full year reflecting the Company's strong value proposition in the growing hydrogen industry

● As previously announced, reported revenue and results were negatively impacted by certain costs of $45 6million recorded in the fourth quarter, the majority being non-cash charges related to the accelerated vesting of a customer's remaining warrants. Given the expenses for this customer program have been fully expensed, the Company's go-forward reported results should be easier to understand. This resulted in reported revenue of negative $316 million for the quarter and negative $100 million for the full year.

● Plan to make continued investment during 2021 to deliver on substantial growth opportunity in the green hydrogen economy on a global basis

● Strong balance sheet with now over $5 billion in cash to execute on its global growth strategy and objectives

● On track to deliver on recently raised 2021 and 2024 financial targets

94.     The statements contained in ¶¶ 90–93 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's financial statements and internal controls were plagued with material deficiencies that would foreseeably inhibit Plug Power from timely filing the 2020 10-K with the SEC; (2) the Company would need to review how it treated certain costs, the recoverability of right to uses assets connected to certain leases, and its own internal controls over these and other areas; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, Plug Power's public statements touting positive metrics, giving optimistic guidance, and attesting to the

efficacy of the Company's internal controls were materially false and misleading at all relevant times.

<u>**The Truth Begins to Emerge**</u>

95.     On March 2, 2021, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC stating that it was unable to file its annual report on Form 10-K by the filing deadline of March 1, 2021. The Notification of Late Filing explained, in pertinent part:

> For the year ended December 31, 2020, Plug Power Inc. (the "Company") became a large accelerated filer for the first time and, as a result, the Company has a shortened filing deadline of 60 days rather than 75 days to file its Annual Report on Form 10-K for the year ended December 31, 2020 (the "Form 10-K"). ***The Company requires additional time to complete the procedures relating to its year-end reporting process, including the completion of the Company's financial statements and procedures relating to management's assessment of the effectiveness of internal controls, and the Company is therefore unable to file the Form 10-K by March 1, 2021, the prescribed filing due date.*** The Company is working diligently to complete the necessary work, ***including review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas. It is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements.*** The Company is still evaluating whether any such charges or adjustments would be required and, if required, whether any such charges or adjustments would be material; but any charges, if required, would be non-cash in nature and any such adjustments or charges would not impact the Company's guidance on forward projections. The Company expects to file the Form 10-K within the extension period provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended.

(Emphasis added.)

96.     On this news, which was released before the markets opened, the Company's share price declined by $3.68 per share—more than 7%—from its March 1, 2021 closing price of $52.46 per share to close on March 2, 2021 at $48.78 per share. This slide continued over the next three trading days, with Plug Power's share price dropping $9.48 per share—an additional 19.4%—to close March 5, 2021 at $39.30 per share.

97.     Later, on March 16, 2021 after the market closed, the Company filed a current report on Form 8-K with the SEC. It stated, in pertinent part:

> **On March 12, 2021, management and the Audit Committee of the Board of Directors** (the "Audit Committee") of the Company, in consultation with KPMG LLP ("KPMG"), the Company's independent registered public accounting firm, **determined that the Company's previously issued financial statements as of and for the years ended December 31, 2019 and 2018, and as of and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, and September 30, 2020 and 2019** (collectively, the "Prior Period Financial Statements"), **should no longer be relied upon due to errors in accounting** primarily relating to (i) **the reported book value of right of use assets** and related finance obligations ("ROU Accounting"), (ii) loss accruals for certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) **the classification of certain expenses previously included in research and development costs** ((i) through (iv) collectively, the "Restatement Items"). **In addition, the fourth quarter and full year 2020 financial results and related discussion included in the Company's shareholder letter furnished on the Form 8-K filed by the Company on February 25, 2021 should no longer be relied upon.**
>
> The Company and the Audit Committee have determined that these accounting changes will require a restatement of the Prior Period Financial Statements.
>
> *       *       *
>
> **The Company also expects that its Form 10-K for the year ended December 31, 2020 will disclose a material weakness in its internal controls over financial reporting** arising from the Restatement Items. As such, KPMG's report on the Company's internal control over financial reporting as of December 31, 2019 should no longer be relied upon.
>
> *       *       *
>
> **The Company expects to restate its financial statements as of and for the years ended December 31, 2019 and 2018 and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, September 30, 2020 and 2019, and December 31, 2019, in its Form 10-K for the year ended December 31, 2020. The Company will not be able to file its Form 10-K for the year ended December 31, 2020 by the March 16, 2021 deadline**, but it is working diligently to finalize the restated financial statements and to file its Form 10-K as soon as practicable.
>
> The Company's internal review is ongoing and the Company may identify further errors. There can be no assurance that the actual effects of the error corrections will be only as described above.

(Emphasis added.)

98.     The same day, on March 16, 2021, the Company issued a press release announcing that the restated filings would be disclosed in the Company's 2020 10-K.

99.     On March 18, 2021, the Company filed a Notice of Delisting with the SEC, informing investors that the Nasdaq Stock Market LLC had notified Plug Power that it was subject to delisting if it failed to file the 2020 10-K by May 17, 2021.

## DAMAGES TO PLUG POWER

100.     As a direct and proximate result of the Individual Defendants' misconduct, Plug Power has lost and will continue to lose and expend many millions of dollars.

101.     Such expenditures include, but are not limited to, the costs of restating the Company's financial statements, fees associated with the Securities Class Actions filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

102.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

103.     As a direct and proximate result of the Individual Defendants' conduct, Plug Power has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

104.    Plaintiff brings this action derivatively and for the benefit of Plug Power to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Plug Power, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

105.    Plug Power is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiff is, and has been at all relevant times, a shareholder of Plug Power. Plaintiff will adequately and fairly represent the interests of Plug Power in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

108.    A pre-suit demand on the Board of Plug Power is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Marsh, Helmer, Kenausis, McNamee, Roth, Schneider, Silver, and Willis (the "Director-Defendants"), and nonparties Kimberly A. Harriman ("Harriman") and Kyungyeol Song ("Song") (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

109.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them conducted lucrative insider sales for proceeds in excess of $39.5 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

110.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111.   Additional reasons that demand on Defendant Marsh is futile follow. Defendant Marsh has served as the Company's CEO and President since April 2008. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Marsh with his principal occupation for which he receives handsome compensation. As CEO, Defendant Marsh was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the November 9, 2020 and February 25, 2021 shareholder letters and the 3Q20 10-Q, all three of which he personally signed. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he sold 573,268 shares of Company common stock at artificially inflated prices for proceeds of over $37.6 million.

Moreover, Defendant Marsh is a defendant in the Securities Class Actions. For these reasons, Defendant Marsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Helmer is futile follow. Defendant Helmer has served as a Company director since January 2004. She also serves as Chair of the Corporate Governance and Nominating Committee and as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Helmer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Kenausis is futile follow. Defendant Kenausis has served as a Company director since October 2013. In addition, he is Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kenausis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant McNamee is futile follow. Defendant McNamee has served as a Company director and as Chairman of the Board since June 1997. He also serves as a member of the Compensation Committee. As Chairman of the Board and a trusted

Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he sold 30,000 shares of Company common stock at artificially inflated prices for proceeds of over $1.8 million. For these reasons, Defendant McNamee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.     Additional reasons that demand on Defendant Roth is futile follow. Defendant Roth has served as a Company director since April 2013. He also serves as a member of both the Compensation Committee and the Corporate Governance and Nominating Committee. Defendant Roth is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Roth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.     Additional reasons that demand on Defendant Schneider is futile follow. Defendant Schneider has served as a Company director since March 2017. He also serves as a member of the Corporate Governance and Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For

these reasons, Defendant Schneider breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Silver is futile follow. Defendant Silver has served as a Company director since June 2018. He also serves as a member of Corporate Governance and Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he sold 1,780 shares of Company common stock at artificially inflated prices for proceeds of over $87,000. For these reasons, Defendant Silver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Willis is futile follow. Defendant Willis has served as a Company director since March 2003. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Willis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on the Board is futile follow.

120.    The Director-Defendants have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Marsh and Kenausis have served simultaneously on the board of GEVO, Inc. since 2015. In addition, Defendant Roth is the founder, chairman, and managing director at FiveT Capital Holding AG, and is a board member of its subsidiary FiveT Capital AG, where Defendant Kenausis has been an investment manager since 2014. Moreover, Defendants Marsh, Helmer, McNamee, and Willis have served together at the Company for well over a decade, with Defendants Helmer and Willis serving 17 and 18 years, respectively, and Defendant McNamee serving for almost 24 years. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

121.    Defendants Helmer, Kenausis, and Willis (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, internal controls, failed to ensure compliance with laws and regulations as they are charged to do under the Audit Committee Charter, and failed to prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

122.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

123.   Plug Power has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Plug Power any part of the damages Plug Power suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

124.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

125.     The acts complained of herein constitute violations of fiduciary duties owed by Plug Power's officers and directors, and these acts are incapable of ratification.

126.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Plug Power. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Plug Power, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

127.     If there is no directors' and officers' liability insurance, then the Directors will not cause Plug Power to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

128.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Plug Power's business and affairs.

131.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

132.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Plug Power.

133.    In breach of their fiduciary duties owed to Plug Power, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial statements and internal controls were plagued with material deficiencies that would foreseeably inhibit Plug Power from timely filing the 2020 10-K with the SEC; (2) the Company would need to review how it treated certain costs, the recoverability of right to uses assets connected to certain leases, and its own internal controls over these and other areas; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, Plug Power's public statements touting positive metrics and giving optimistic guidance were materially false and misleading at all relevant times.

134.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while three of them conducted insider sales of Company common stock for proceeds in excess of $39.5 million, which renders them personally liable to the Company for breaching their fiduciary duties.

135.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

136.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Plug Power's securities.

137.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Plug Power's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

138.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Plug Power has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff on behalf of Plug Power has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

141.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Plug Power.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Plug Power that was tied to the performance or artificially inflated valuation of Plug Power, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of Plug Power, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff on behalf of Plug Power has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Plug Power, for which they are legally responsible.

148.    As a direct and proximate result of the Individual Defendants' abuse of control, Plug Power has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff on behalf of Plug Power has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Plug Power in a manner consistent with the operations of a publicly-held corporation.

152.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Plug Power has sustained and will continue to sustain significant damages.

153.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

154.    Plaintiff on behalf of Plug Power has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

157.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Plug Power to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

158.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

159.    Plaintiff on behalf of Plug Power has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Marsh and Middleton for Contribution Under Sections 10(b) and 21D of the Exchange Act

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Plug Power, and Defendants Marsh and Middleton are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the

federal securities laws, the Company's liability will be in whole or in part due to Defendants Marsh's and Middleton's willful and/or reckless violations of their obligations as officers and/or directors of Plug Power.

162.    Defendants Marsh and Middleton, because of their positions of control and authority as CEO and CFO of Plug Power, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Plug Power, including the wrongful acts complained of herein and in the Securities Class Actions.

163.    Accordingly, Defendants Marsh and Middleton are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

164.    As such, Plug Power is entitled to receive all appropriate contribution or indemnification from Defendants Marsh and Middleton.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Plug Power, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Plug Power;

(c)    Determining and awarding to Plug Power the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Plug Power and the Individual Defendants to take all necessary actions to reform and improve Plug Power's corporate governance and internal procedures to comply with applicable laws and to protect Plug Power and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Plug Power to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Plug Power restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated:  March 31, 2021                      Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I,   Junwei Liu   am   a   plaintiff   in   the   within   action. I   have   reviewed   the   allegations   made   in   this   shareholder   derivative complaint, know   the   contents   thereof,   and   authorize   its   filing.   To   those allegations   of which   I have   personal   knowledge,   I believe   those   allegations   to be   true.   As to   those allegations   of which   I   do   not   have   personal knowledge,   I rely  upon  my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2021.

3/31/2021

DocuSigned by:

*Junwei Liu*

555B180F615A43A...

Junwei Liu